IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SAYBREE FILLYAW, ) | |
|     Plaintiff, ) | |
| ) | |
| vs. ) | No. 3:22-CV-1112-N (BH) |
| ) | |
| COMMUNITY NATIONAL BANK & ) | |
|  TRUST, et al., ) | |
|     Defendants. ) | Referred to U.S. Magistrate Judge[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Based on the relevant filings and applicable law, the plaintiff's claims should be **DISMISSED WITH PREJUDICE** under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim.

**I.   BACKGROUND**

Saybree Rayshawn Fillyaw (Plaintiff) claims that Community National Bank & Trust (Bank) and its president (President); Bank's title company, Navarro County Abstract Title (Title Company), two of its employees and its attorney/escrow officer (Attorney); Boston National Title BN Title) and its owner and escrow agent (BN Owner); and WFG Title and its escrow agent (WFG Agent) violated her constitutional rights by racially discriminating against her and thwarting her real-estate transactions by breaching and interfering with contracts. (*See* doc. 35.)

Plaintiff's final amended complaint[2] appears to allege that in 2021, she asked an employee if Title Company would provide title insurance for a real-estate transaction. (*Id.* at 3.)[3] The

---

[1] By *Special Order No.* 3-251, this *pro se* case has been automatically referred for full case management.

[2] In addition to her complaint (doc. 3), amended complaint (doc. 9), and answers to a magistrate judge questionnaire (MJQ) (doc. 14), Plaintiff filed several documents without leave of Court despite an order prohibiting supplements or amendments without leave (doc. 6), including five5 amendments to her MJQ responses and over 200 pages of attachments (docs. 15, 16, 17, 18, 19, 20, 21, 22, 23, 25, 27).  Noting that the number of filings unduly complicated the judicial screening process, Plaintiff was ordered to file a final amended complaint containing all her claims and allegations, and she complied. (docs. 28, 35.)

[3] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

employee knew that Plaintiff had contracts in place with "employee/partner/buyers," but along with other Title Company staff, said they "thought blacks were messed up people to them," and they were not going to allow Plaintiff to use Title Company because she is black. (*Id.* at 3-4.) Nor would they stop the "interference" with her "employee/partner/buyers's" contracts. (*Id.* at 4.)

For example, Attorney gave confidential information about Plaintiff's contracts with "employees/partners/buyers" to the 92-year-old niece (Niece) of one of Plaintiff's "customers." (*Id.* at 4.) Title Company employees questioned aspects of real-estate contracts that Plaintiff claimed to have, including the legitimacy of a power of attorney by which Niece authorized the transfer of property to, or some entity associated with, Plaintiff. (*Id.* at 4-5.)[4] They also called Plaintiff's "employee/partner/buyers" and told them that the power of attorney was not real. (*Id.* at 5.) A Title Company employee kidnapped Niece to "get control of her properties and stop sales for her benefit" and had the original power of attorney revoked to stop the "gift and all sales" from Niece to Plaintiff. (*Id.*)

A Title Company employee and Attorney also called Plaintiff's title company and gave them false information, which prevented deals from going forward. (*Id.* at 6.) They bribed Boston National Title to breach a contract and not issue "title policy or insurance policy." (*Id.* at 7-8.) This caused Plaintiff and her associates to lose money, potential sales, and relationships. (*Id.* at 8, 10.)

---

[4] Plaintiff filed various contracts into the record, including a "Sales Contract for Real Estate" between United Homevestors as the buyer and Ovrealty Solution/Plaintiff as the seller for property in Corsicana (doc. 16-2 at 1); a finder's fee agreement between Chris J. and Plaintiff "of Deal Image Investors" and Amdigon L.L.C. to find property for sale (doc. 21-1 at 1-4); an "Assignment of Contract of Sale" between Serious Home Buyers and Deal Image Investors in which Serious Home Buyers transferred its right to buy property in Corsicana to Amdigon L.L.C. (doc. 21-1 at 1-3); a series of form contracts entitled "One to Four Family Residential Contract (Resale)," some of which list Plaintiff as a party (doc. 17-1 at 1-10), (doc. 22 at 1-15), (doc. 23-3 at 1-10), (doc. 23-5 at 1-11), (doc. 23-7 at 1-10), (doc. 23-8 at 1-11), (doc. 23-9 at 1-10), (doc. 23-10 at 1-10) (doc. 23-11 at 1-11), (doc. 23-12 at 1-10), (doc. 23-13 at 1-10), (doc. 23-14 at 1-10), (doc. 23-15 at 1-10), (doc. 23-19 at 1-10), (doc. 23-20 at 1-11); a commitment for title insurance issued by Agents National Title Insurance Company providing title insurance to "Ollie Valley Realty, LLC" (doc. 16-1 at 1); a commitment for title insurance between WFG National Title Insurance Company and Texas Mutual LLC (doc. 23-6 at 4-25); a commitment for title insurance between WFG National Title Insurance Company and Amdigon, L.L.C., (doc. 23-17 at 1-13); and a finder's fee agreement between Redwood Buyers, LLC and Plaintiff related to a real-estate contract between Redwood Buyers, LLC and Joseph Johnson (doc. 23 at 1.)

Plaintiff asked President to stop interfering with her contracts; when asked if he had a problem with her because she is black, he responded, "yes, who would want to work for blacks there [sic] loud, and who would want to work for you…?" (*Id.* at 8-9.) He informed Plaintiff that he would not direct his staff to stop interfering with her contracts. (*Id.* at 9.) Some of Plaintiff's white friends used Title Company to buy houses in Corsicana, Texas, without issue. (*Id.*)

Title Company also agreed with WFG Title, through WFG Agent, to interfere with Plaintiff's contracts. (*Id.* at 13.) Title Company gave false information to WFG Title, i.e., that the power of attorney that was used to execute contracts on behalf of Niece was not real. (*Id.* at 13.) WFG Agent informed Plaintiff that WFG Title would not honor the power of attorney. (*Id.*)

Title Company hacked Plaintiff's telephone and e-mail and continue to stalk her by flying a drone outside of her house. (*Id.* at 15, 18.) One of its employees has tried to use the courts to prevent Plaintiff from obtaining guardianship over the niece. (*Id.* at 15.)

Title Company bribed the Texas Department of Insurance not to write them up for violations. (*Id.* at 18.) (TDI). The Texas Adult Protective Services (API) found Title Company's employee guilty of extorting Niece. (*Id.*) Title Company and its employees bribed "folks," including a Justice of the Peace, to arrest and evict Plaintiff, which has prevented her from running her business. (*Id.* at 18-19.)

Plaintiff seeks $9 million in monetary damages. (doc. 12 at 14.)

## II. PRELIMINARY SCREENING

Because Plaintiff has been permitted to proceed *in forma pauperis* (IFP), her complaint is subject to screening under 28 U.S.C. § 1915(e)(2)(B). That statute provides for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if

it fails to state a claim upon which relief may be granted, or if it seeks monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Courts follow the same analysis in determining whether a complaint fails to state a claim under § 1915(e)(2)(B) as when ruling on a motion to dismiss under Rule 12(b)(6). *See Hale v. King*, 642 F.3d 492, 497 (5th Cir. 2011) (per curiam). A complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Neither mere "labels and conclusions" nor "a formulaic recitation of the elements of a cause of action" suffice to state a claim upon which relief may be granted. *Id.*

### III.   42 U.S.C. § 1983

Plaintiff's claims that Defendants violated her constitutional rights arise under 42 U.S.C. § 1983. "To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and the laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Cornish v. Correctional Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005) (emphasis added).

There is no indication from Plaintiff's filings that any defendant is a state actor—they all appear to be private companies and individuals. In some circumstances, a private party may be acting "under color of state law" and held liable under § 1983. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). In *Priester v. Lowndes Cty.*, 354 F.3d 414 (5th Cir. 2004), *cert. denied*, 543 U.S. 829 (2004), the Fifth Circuit explained that "[f]or a private citizen…to be held liable under § 1983, the plaintiff must allege that the citizen conspired with or acted in concert with state actors." *Id.* at 420 (citing *Mylett v. Jeane,* 879 F.2d 1272, 1275 (5th Cir. 1989) (per curiam)). The

4

plaintiff must allege: (1) an agreement between the private and public defendants to commit an illegal act, and (2) a deprivation of constitutional rights. *Id.*

In the absence of an alleged conspiracy with a state actor, a private party can be treated as a state actor (1) when there is a sufficiently close nexus between the state and the challenged action of the private party so that the action of the party may be fairly treated as that of the state itself, (2) where the private party has exercised powers that are "traditionally the exclusive prerogative of the state," or (3) where the state has exercised coercive power or has provided such significant encouragement, either overt or covert, that the action of the private party must in law be deemed that of the state. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).

Plaintiff has not alleged that any defendant conspired with a state actor or any facts showing state action. Because she fails to allege any state action, any § 1983 claims should be dismissed.

## IV. FAIR HOUSING ACT

Because Plaintiff claims that Title Company discriminated against her because of her race in relation to a real-estate transaction, consideration of whether she has stated a claim under the Fair Housing Act (FHA), 42 U.S.C. §§ 3601 *et seq.* 42 U.S.C. § 3604(a) is warranted. The FHA makes it "unlawful…[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Only the "otherwise make unavailable or deny[] a dwelling" language appears relevant.[5]

Plaintiff has not plausibly alleged that any property she was attempting to buy was a "dwelling" under the FHA. The FHA defines a dwelling as:

---

[5] It is unclear from Plaintiff's allegations whether she was a prospective seller or buyer of property. The contracts that she filed indicate that she was trying to sell property. (*See* doc. 16-2.) If so, the statute, by its plain terms, is inapplicable because she was not deprived of a "dwelling", but rather an opportunity for an economic transaction.

5

> Any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.

42 U.S.C. § 3602(b).

"Residence" is not defined in the statute, but jurisprudence has interpreted it to mean a "temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit." *Germain v. M&T Bank Corp.*, 111 F.Supp.3d 507, 522-23 (S.D.N.Y. 2015). "Based on these definitions and criteria, and the decisions of the courts that have applied them, it is clear that in determining whether a particular building is a dwelling or residence, the focus is on whether the individuals that are subject to discrimination use or intend to use the building as a dwelling or residence." *Id.* at 523 (citing *Hovsons. Inc. v. Township of Brick*, 89 F.3d 1096, 1102 (3d Cir. 1996); *New York City Dep't of Homeless Servs.*, 643 F.Supp.2d 507, 518 (S.D.N.Y. 2009); *Tara Circle Inc. v. Bifano*, No. 95-CIV. 6522 (DLC), 1997 WL 399682, at *16 (S.D.N.Y. July 15, 1997)). "[T]he FHA does not apply to the sale of residential property to a person who is buying the property as a commercial venture, has no intention of residing in the property, and is not suing on behalf of protected class members who reside there." *Shaikh v. City of Chicago*, No. 00 C 4235, 2001 WL 123784, at *2-4 (N.D. Ill. Feb. 13, 2001); *see also Lunini v. Grayeb*, 305 F.Supp.2d 893 (C.D. Ill. 2004); *Home Quest Mort. LLC v. American Family Mut. Ins. Co.*, 340 F.Supp.2d 1177, 1186 (D. Kansas 2004).

Even if Plaintiff was trying to buy property and is alleging that Title Company employees somehow interfered, there is no indication from her pleadings that she intended to reside at the property or is suing on behalf of protected class members who will reside there. Any claim under § 3604(a) is meritless.

Also potentially relevant is 42 U.S.C. § 3605(a), which makes it "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin. 42 U.S.C. § 3605(a). The FHA defines such "residential real estate-related" transactions as "(1) the making or purchasing of loans or providing other financial assistance— (A) for purchasing, constructing, improving, or maintaining a dwelling; or (B) secured by residential real estate," as well as "(2) [t]he selling, brokering, or appraising of residential real property." *Id.* § 3605(b). Any claim under this section of the FHA also fails because there is no indication that Title Company engaged in "residential real estate-related" transactions as that term is defined.

To the extent that Plaintiff's pleadings could be liberally construed as asserting an FHA claim, it lacks merit and should be dismissed.

### V.     42 U.S.C. § 1981

"[Section] 1981 prohibits racial discrimination, both public and private, in the making or enforcement of contracts." *Gallentine v. Housing Auth. of City of Port Arthur, Tex.*, 919 F.Supp.2d 787, 807 (E.D. Tex. 2013) (collecting cases). To sustain a § 1981 claim, Plaintiff must establish (1) that she is a member of a racial minority; (2) that a defendant had intent to discriminate based on race; and (3) that the discrimination concerned one or more activities enumerated in the statute, in this instance, the making and enforcing of a contract. *Morris v. Dillard Dep't. Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001) (citation omitted).

Although Plaintiff has vaguely alleged that Defendants breached contracts, she has not identified any specific contract that she has with a named Defendant, and none is apparent. Her

claims instead appear to be premised on a tortious interference with contract theory. For purposes of § 1981, however, "[t]he contract at issue must be between the plaintiff and the defendant; Section 1981 only allows a non-party to the contract to be held liable when the non-party and a contracting party 'are essentially one and the same.'" *Blue Mint Pharco, LLC v. Texas State Bd. of Pharmacy*, ---F.Supp.3d---, 2023 WL 2717265, at *13 (S.D. Tex. Mar. 30, 2023) (citation omitted). Plaintiff does not allege that any Defendant was "essentially one and the same" as a party that she contracted with. *Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 931-33 (5th Cir. 2021). Any § 1981 claim fails.

### VI. STATE LAW CLAIMS

Liberally construing her pleadings, Plaintiff claims that Defendants breached and interfered with contracts. (*See generally* doc. 35.)

Under 28 U.S.C. § 1367(a), federal courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within [its] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." In essence, § 1367(a) grants the courts the "power to hear a state law claim under pendant or supplemental jurisdiction if (1) the federal issues are substantial, even if subsequently decided adverse to the party claiming it; and (2) the state and federal claims derive from a common nucleus of operative fact." *McKee v. Texas Star Salon, LLC*, No. 3:15-CV-1162-D, 2007 WL 2381246, at *4 (N.D. Tex. Aug. 21, 2007) (citations omitted); *see also United Mine Workers v. Gibbs*, 383 U.S. 715, 727 (1996).

When all federal claims are dismissed prior to trial, the general rule in this circuit is to decline exercising jurisdiction over the remaining state law claims. *LaPorte Constr. Co. v.*

*Bayshore Nat'l Bank*, 805 F.2d 1254, 1257 (5th Cir. 1986); *see also* 28 U.S.C. § 1367(c)(3).[6] This rule is "neither mandatory nor absolute." *Smith v. Amedisys Inc.*, 298 F.3d 434, 447 (5th Cir. 2002) (citation omitted). Rather, district courts are given wide discretion in deciding whether to exercise jurisdiction under such circumstances. *See Heaton v. Monogram Credit Card Bank*, 231 F.3d 994, 997 (5th Cir. 2000); *Noble v. White*, 996 F.2d 797, 799 (5th Cir. 1993); *see also United Mine Workers*, 383 U.S. at 726 ("[P]endant jurisdiction is a doctrine of discretion, not of [a] plaintiffs right."). In exercising this discretion, courts should consider issues of judicial economy, convenience, and fairness to the litigants. *LaPorte Constr. Co.*, 805 F.2d at 1257. However, "no single factor is dispositive." *Mendoza v. Murphy*, 532 F.3d 342, 346 (5th Cir. 2008).

Here, the factors weigh in favor of retaining jurisdiction over any state law claims because they arise from the same "common nucleus of operative facts" as the federal claims. Requiring Plaintiff to litigate her claims in state court would "necessarily require consideration by two distinct courts of the same operative fact[s]" and the "same legal issues." *See McKee*, 2007 WL 2381246, at *4. Given that Plaintiff's claims are meritless, allowing her to file suit in state court would impose unnecessary expenses on the court system and the parties involved. *See McCall v. Peters*, No. 3:00-CV-2247-D, 2003 WL 21488211, at *12 (N.D. Tex. May 11, 2003), *aff'd*, 108 F. App'x 862 (5th Cir. 2004) (in determining whether to exercise pendant or supplemental

---

[6]Under 1367(c), a court may decline to exercise supplemental jurisdiction over a state claim if:

(1) the claim raises a novel or complex issue of law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it had original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

jurisdiction, the court may consider factors such as the amount of time and resources spent adjudicating a case).

    A.    **Breach of Contract**

To prevail on a breach of contract claim under Texas law, the plaintiff must sufficiently allege: (1) a valid contract existed between the plaintiff and the defendant; (2) the plaintiff tendered performance or was excused from doing so; (3) the defendant breached the terms of the contract; and (4) the plaintiff sustained damages as a result of the defendant's breach. *Borneo Energy Sendirian Berhad v. Sustainable Power Corp.*, 646 F.Supp.2d 860, 869-870 (S.D. Tex. 2009) (emphasis added) (citing *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet)).

Here, Plaintiff never identifies a contractual relationship with a named defendant. She alleges that Title Company and its employees *refused* to contract with her. She does not allege that she had a contract with Boston National Title or WFG Title or that she was a third-party beneficiary to a contract involving those entities, and no contractual relationship is apparent from her filings. "'[A] party generally must be a party to a contract before it can be held liable for a breach of the contract.'" *Ibe v. Jones*, 836 F.3d 516, 524 (5th Cir. 2016) (quoting *Hoffman v. AmericaHomeKey, Inc.*, 23 F.Supp.3d 734, 739 (N.D. Tex. 2014)). Plaintiff fails to plausible allege a contractual relationship with any defendant, so she fails to state a breach of contract claim under Texas law.

    B.    **Tortious Interference with Contract.**

Plaintiff claims that Defendants interfered with her contracts by: (1) telling her "employee/buyers/partners" and others that the power of attorney that Niece authorized for the disposition of her property was "not real" (doc. 35 at 5); (2) attempting to undo or prevent Niece's "gifts" and "sales" with Plaintiff by revoking her power of attorney (*Id.*); (3) giving false

10

information to Plaintiff's title company that delayed the performance of contracts and caused buyers to "run off" (*Id.* at 6); (4) sending threatening emails to an unspecified entity to not respond to Plaintiff's title request (*Id.*); (5) bribing BN Title to breach a contract to issue a title insurance policy (*Id.* at 8); (6) bribing WFG Title to breach a contract (*Id.* at 13); and (7) "fabricating cases" against Plaintiff related to the guardianship of her "customer," Niece. (*Id.* at 15).

Under Texas law, "[t]he elements of tortious interference with contract are (1) a contract subject to interference; (2) a willful and intentional act of interference (3) that was a proximate cause of the plaintiff's damages; and (4) actual damage." *Cuba v. Pylant*, 814 F.3d 701, 717 (5th Cir. 2016) (citing *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 210 (Tex. 1996)). The plaintiff must show that "'the defendant knowingly induced one of the contracting parties to breach its obligations under the contract.'" *Id.* (quoting *All Am. Tel., Inc. v. USLD Commc'ns, Inc.*, 291 S.W.3d 518, 532 (Tex. App. 2009)). The intent element requires that the party asserting a tortious interference claim show either that the interfering party had "actual knowledge of the contract and of the plaintiff's interest in it" or "knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and the plaintiff's interest in it." *Exxon Corp. v. Allsup*, 808 S.W.2d 648, 656 (Tex. App.—Corpus Christi 1991, writ denied).

To show proximate cause, "a plaintiff must allege that 'the defendant took an active part in persuading a party to a contract to a party to breach it.'" *Hambric Sports Mgmt., LLC v. Team AK, Inc.*, Civil Action No. 3:09-CV-1662-L, 2010 WL 2605243, at *9 (N.D. Tex. June 29, 2010) (citing *Amigo Broad., LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472, 489 (5th Cir. 2008)). "'Merely entering into a contract with a party with the knowledge of that party's contractual obligations to someone else is not the same as inducing a breach.'" *Id.* "'It is necessary that there be some act of interference or of persuading a party to breach, for example by offering better terms or other

11

incentives, for tort liability to arise.'" *Id.* (quoting *Davis v. HydPro, Inc.*, 839 S.W.2d 137, 139 (Tex. App.—Eastland 1992, writ denied).

Except for one exception discussed below, Plaintiff does not specifically identify a contract that was interfered with—much less a specific contractual provision. Her vague allegations of unspecified contracts with which Defendants interfered are insufficient. *See*, *e.g.*, *Antero Resources Corp. v. C & R Downhole Drilling, Inc.*, Action No. 4:16-CV-668-Y, 2021 WL 9969511, at *3 (N.D. Tex. June 8, 2021) ("Kawcak wholly fails to identify with any specificity the contract to which he refers, however, nor does he specify any contractual provision that obligated Fidelity to make the requested transfer upon his request. Because Kawcak fails to specifically identify any contract or contractual provision between himself and Fidelity with which Antero interfered, he has failed to state a plausible claim for relief."); *McDonald Oilfield Operations, LLC v. 3B Inspection, LLC*, 582 S.W.3d 732, 752 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (op. on reh'g) ("A general statement that a contract with a customer exists, without details about the specific terms of the contract, is insufficient to maintain a tortious-interference-with-contract claim.") (citations omitted); *M-I LLC v. Stelly*, 733 F.Supp.2d 759, 774-75 (S.D. Tex. 2010) ("Without identifying an existing contract that is subject to interference, M-I has failed to plead adequately the first element of a tortious interference with contract claim.").

The closest Plaintiff gets to identifying a specific contract is her conclusory allegation that a Title Company employee bribed BN Title to breach a contract to issue title insurance. (doc. 35 at 8.) She has not alleged that she was a party to that contract, and nothing in her filings indicates that she was. She has not established that she has the standing to pursue a tortious interference with contract claim. *See*, *e.g.*, *Baisden v. I'm Ready Prod., Inc.*, 693 F.3d 491, 509-510 (5th Cir. 2012) ("Baisden was not a party to the contract and thus cannot assert a claim for tortious

interference.") (citing *Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 250 (Tex. App.—Dallas 2005, no pet.); *Hill v. Baylor Univ. Med. Ctr.*, No. 05-97-00238, 2000 WL 31795, at *13 (Tex. App.—Dallas Jan. 18, 2000, pet. denied)).

Plaintiff fails to plausibly allege a tortious interference with contract claim under state law and such claim should be dismissed.

### VII. LEAVE TO AMEND

The Fifth Circuit is inclined to give *pro se* plaintiffs several opportunities to state a claim upon which relief can be granted. *See Scott v. Brynes*, No. 3:07-CV-1975-D, 2008 WL 398314, at *1 (N.D. Tex. Feb. 13, 2008); *Sims v. Tester*, No. 3:00-CV-0863-D, 2001 WL 627600, at *2 (N.D. Tex. Feb. 13, 2001). Courts therefore typically allow *pro se* plaintiffs an opportunity to amend their complaints when the action is to be dismissed pursuant to a court order. *See Robinette v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 3:96-CV-2923-D, 2004 WL 789870, at *2 (N.D. Tex. Apr. 12, 2004); *Sims*, 2001 WL 627600, at *2.

Leave to amend is not necessary, however, where the plaintiff has already plead her best case. *See Wiggins v. La. State Univ.—Health Care Servs. Div.*, 710 F. App'x 625, 627 (5th Cir. 2017) (citations omitted). Here, Plaintiff has had ample opportunity to plead her best case. She responded to a detailed MJQ. A verified questionnaire response allows a plaintiff to plead his or her best case and is a valid way for a *pro se* litigant to amend her complaint. *See Nixon v. Abbott*, 589 F. App'x 279 (5th Cir. 2015) (per curiam) ("Contrary to Nixon's argument, he was given the opportunity to amend his complaint in his responses to the magistrate judge's questionnaire, which has been recognized as an acceptable method for a pro se litigant to develop the factual basis for his complaint."). Further, the Court gave Plaintiff a chance to plead her best case by filing a final amended complaint, explaining that she would not be able to file anything else without leave of

Court. (doc. 28.) Despite opportunity to allege her best case, Plaintiff has failed to present any cognizable claims. Further leave to amend is neither necessary nor warranted.

## VIII.  RECOMMENDATION

Plaintiff's claims should be **DISMISSED WITH PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim.

**SO RECOMMENDED** on August 22, 2023.

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*[signature]*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE